IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 17, 2024

**MICHAEL D. LEWIS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
No. 83571    James A. Turner, Judge
_____

**No. M2023-01659-CCA-R3-PC**
_____

Pursuant to a plea agreement, Petitioner, Michael D. Lewis, pleaded guilty to four counts of statutory rape by an authority figure and received an effective sentence of twenty years' incarceration. Thereafter, Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, Petitioner claims that trial counsel rendered ineffective assistance because counsel: (1) was unprepared for trial and failed to develop a defense; (2) failed to inform Petitioner "of the potential merits of his motion to suppress the State's evidence" before Petitioner entered a plea agreement; and (3) failed to contact material witnesses named by Petitioner that may have benefited his defense. We affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Robert L. Sirianni, Jr., Winter Park, Florida, for the appellant, Michael D. Lewis.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Shari Lynn Tayloe, District Attorney General; Sharon Reddick and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Procedural Background**

On June 17, 2020, the Rutherford County Grand Jury indicted Petitioner for four counts of Class C felony sexual battery by an authority figure (Counts 1 through 4) and ten counts of Class B felony statutory rape by an authority figure (Counts 5 through 14). The

indictment alleged that all fourteen offenses occurred between July 21, 2013, and July 20, 2017. Pursuant to a plea agreement, Petitioner entered guilty pleas to Class C felony statutory rape by an authority figure in Counts 5, 6, 7, and 8.[1]

## Guilty Plea Submission Hearing

The transcript of the February 14, 2022 plea submission hearing included the following factual basis for the guilty pleas provided by the State:

> [I]n the spring of 2014, the victim, who is named in the indictment and whose date of birth is July 21, 2000, was a 13-year-old 8th grader at St. Rose of Lima Catholic School where her mother was a kindergarten teacher.
>
> She and her mother and brother were also active members of the St. Rose of Lima Parish. The school and the church are both located here in Rutherford County.
>
> At that time[, Petitioner] was a 36-year-old man professionally employed at St. Rose of Lima Parish as their Director of Religious Education. He was married with six children.
>
> In the months leading up to the spring of 2014, through their mutual church affiliation, [Petitioner]'s family and the victim's family became friends, engaging in many activities together, both related to the church and outside of the church.
>
> The victim would testify in the spring of 2014, she was preparing to be confirmed as a full member of the church. And that as part of her confirmation preparation, she was required to select a confirmation sponsor, an adult who would mentor her through that process of confirmation.
>
> Because of the friendly relationship she had with [Petitioner] and his family, and because he appeared to be a particularly knowledgeable and committed Catholic, she asked him to be her confirmation sponsor.

---

[1] According to the February 14, 2022 judgments of conviction for Counts 5, 6, 7, and 8, the offense date for each count was between July 1, 2013, to June 30, 2016. Effective July 1, 2016, statutory rape by an authority figure became a Class B felony. *See* 2016 Tennessee Laws Pub. Ch. 1086 (H.B. 2399). Based on the offense date in the judgments of conviction for Counts 5, 6, 7, and 8, statutory rape by an authority figure was a Class C felony. *See* Tenn. Code Ann. § 39-13-532(4)(b) (2015).

The victim would testify that in the weeks leading up to her confirmation there were times [Petitioner] touched her in ways that made her feel uncomfortable. But she had also, by that time, developed a trust relationship with him based on his position in the church and his relationship with her family. So, she was confused about the unwanted touching.

She would testify that the first incident of overtly sexual touching occurred at [Petitioner]'s home on Morris Drive here in Rutherford County some weeks after her confirmation when the victim's mother . . . and [Petitioner]'s wife[,] Nicole Lewis, went out to dinner leaving [Petitioner] home with all of the children, including the victim.

At some point during the evening, [Petitioner] got the victim alone in a bedroom, kissed her on the mouth, fondled her breasts and genitalia, and penetrated her genitals with his fingers.

Thereafter, [Petitioner] began engaging in sexual contact and sexual penetration with the victim repeatedly and routinely.

Witnesses would testify that at some point during the development of the relationship between the two families, [Petitioner] and the victim's mother began having a clandestine affair themselves. [The victim's mother] would testify that she believed that [Petitioner] was going to leave his wife and be with her, and that [Petitioner] was in a committed relationship with her.

As such, she trusted [Petitioner] as a sort of father figure to the children, giving him unfettered access to the victim, including allowing him to regularly spend time alone with her, and allowing him to take her alone on trips out of town.

The victim would testify that over the course of approximately two and a half years, [Petitioner] perpetrated multiple acts of sexual penetration against her, including fellatio, cunnilingus, digital penetration, penile-vaginal penetration, and penile-anal penetration.

[Petitioner] perpetrated these offenses at his residence on Morris Drive, at his subsequent residence on Haynes Drive, and at the victim's home here in Rutherford County. [Petitioner] also perpetrated the offenses in his vehicle after picking the victim up from school, and in his vehicle on the way to church related functions.

[Petitioner] also perpetrated these offenses at various locations around St. Rose of Lima, including [Petitioner]'s office, in a supply closet, in the school hallway, and in the communion preparation room, also referred to as the sacristy.

Witnesses would testify that in the fall of 2016, [the victim's mother] ended her relationship with [Petitioner] and cut off contact between him and her family. Thereafter, the victim had no further contact with [Petitioner], and the sexual abuse ended.

The victim would testify that she told no one about the sexual abuse until late 2019, early 2020. At which time she reached out to a personal acquaintance, Sean White, who also happened to be a Rutherford County Sheriff's Deputy.

Deputy White would testify that upon hearing the allegations, he encouraged the victim to formally report them. And he put her in touch with another Deputy to take a report.

On January 16, 2020, the victim reported the allegations to the Rutherford County Sheriff's Department. Detective Patty Oeser of the Rutherford County Sheriff's Department was assigned to investigate.

Detective Oeser would testify that the victim came in for an interview, during which she reported the multiple acts of sexual penetration. Detective Oeser would testify that the victim also showed her a message that [Petitioner] had sent her some months prior via Facebook Messenger. The victim reported that she had not responded to the message.

And Detective Oeser would testify that she determined that a pretext communication with [Petitioner] wherein the victim would attempt to discuss the past sexual abuse with [Petitioner] might elicit statements of evidentiary value.

The victim consented to try and engage [Petitioner] by responding to the Facebook message. Detective Oeser would testify that during the months of April and May of 2020, and under the guidance of Detective Oeser, the victim exchanged multiple Facebook messages with [Petitioner] wherein they discussed their past relationship beginning when she was 13 years old.

- 4 -

Contained in these messages are multiple admissions made by [Petitioner] that the relationship was of a sexual nature. These Facebook messages were secured via search warrant to Facebook, and would have been available had [] this matter gone to trial.

Detective Oeser would testify that on May 21, 2020, the victim came to her office at the Rutherford County Sheriff's Department and engaged in what is referred to as a controlled telephone conversation with [Petitioner].

During the call, which was recorded and transcribed, [Petitioner] made multiple statements acknowledging the sexual nature of the relationship with the victim beginning when she was 13 years old. During the conversation, [Petitioner] acknowledged and discussed multiple specific instances of sexual penetration, fully corroborating the victim's allegations.

After the controlled call was terminated, but before the victim left Detective Oeser's office, [Petitioner] began attempting to communicate with her again via Facebook Messenger. Still under the guidance of Detective Oeser, the victim responded nominally to these attempts at communication by [Petitioner], which included highly eroticized language and images of his erect penis.

Detective Oeser would testify that upon [Petitioner]'s arrest, she gave him his *Miranda* Warnings, and he signed a *Miranda* Waiver and agreed to be interviewed. During the interview, which was audio and video recorded, [Petitioner] initially denied any inappropriate contact with the victim, asserting that he thought of himself as a father figure to her.

But, ultimately, he acknowledged most of the allegations made by the victim, including making admissions that the sexual penetration had occurred in multiple locations in Rutherford County and elsewhere beginning when she was 13 years old.

The trial court thoroughly explained the constitutional rights guaranteed to Petitioner, including the presumption of innocence, the right to remain silent, the right to a speedy and public trial by jury, the right to counsel, the right to confront the witnesses against him, and the right to subpoena witnesses and compel their attendance. Petitioner acknowledged that he understood and wished to waive his rights. Petitioner agreed that the factual basis presented by the State was essentially true. He stated that he understood the elements of the offenses that the State would be required to prove for him to be found guilty and the range of punishment for each offense. Petitioner stated that no one was

forcing or coercing him to plead guilty and that no one had promised him anything not contained in the plea agreement to induce him to plead guilty. He agreed that he was entering the pleas freely and voluntarily.

The trial court also discussed with Petitioner the pendency of several defense motions, as follows:

Q. Also, last week we intended on having some evidentiary motions associated with your case. Do you recall that?

A. Yes, Your Honor.

Q. And all those motions, did you discuss that with [trial counsel]?

A. Yes, Your Honor.

Q. And you understand this Court made no ruling associated with those motions?

A. Yes, Your Honor.

Q. However, is it your decision to waive your right to have those motions heard in order to enter these pleas today?

A. Yes, Your Honor.

Pursuant to the plea agreement, the trial court sentenced Petitioner as a Range I standard offender to five years on each count with the sentences to be served consecutively for an effective sentence of twenty years. The court also ordered Petitioner "to comply with the mandates of the sex offender registry for life." The judgments of conviction were entered on February 14, 2022.

## Post-Conviction Petition

On January 24, 2023, Petitioner through retained counsel filed a Petition for Relief from Conviction or Sentence ("the Petition") claiming: (1) that his "guilty plea was unlawfully induced, or his guilty plea was involuntarily entered without understanding the nature and consequences of the plea" and (2) that he was denied the effective assistance of counsel. Simultaneously, post-conviction counsel filed a memorandum of law in support of the Petition. The State filed a response to the Petition and a brief in support of its response.

Petitioner's claims of ineffective assistance of counsel were set out in narrative form, primarily in the affidavit of Petitioner attached to the memorandum of law and, to a lesser extent, in the memorandum itself. There was no "list" of claims. As best as we can tell, the Petition claimed that Petitioner was denied effective assistance because trial counsel:

1. failed to adequately prepare for trial and, as a result, Petitioner had no other option than to plead guilty;
2. insisted Petitioner take a negotiated plea;
3. failed to adequately explain the difference between a guilty plea versus a plea of no contest;
4. failed to interview and call witnesses or obtain videos from the sacristy of the St. Rose of Lima Catholic Church that would have shown that he could not have committed the offenses at some of the times the offenses were alleged to have occurred;
5. failed to contact and call the character witnesses identified by Petitioner;
6. failed to provide Petitioner with all of the State's discovery;
7. never attempted to rebut the allegation that he was an authority figure over the victim; and
8. failed to challenge the consecutive alignment of the sentences.

## Post-Conviction Hearing

Trial counsel testified that he was hired after Petitioner was questioned by agents from the Federal Bureau of Investigation (F.B.I.) concerning a church trip to Alabama where Petitioner was alleged to have perpetrated sexual acts against the victim. Petitioner's prior counsel recommended that Petitioner obtain other representation because prior counsel did not practice in federal court. Trial counsel said that an F.B.I. agent was present during the interview by a Rutherford County detective and that Petitioner admitted to perpetrating sexual acts in Alabama.

In August 2021, trial counsel filed a motion to withdraw from representation because Petitioner stopped paying his legal fees. The trial court denied the motion because the case was set for trial. Trial counsel stated that he did not recall telling the trial court in August 2021 that he was not prepared for trial but explained that, even if he said that, he had adequate time to prepare for the February 2022 trial.

Trial counsel said that the first time he heard about videos from the church was when he read Petitioner's affidavit, which was attached to the post-conviction memorandum. He denied telling Petitioner that there was no difference between a Class C and a Class B felony. He also denied telling Petitioner that he might be eligible for diversion, avowing

to the contrary, that he specifically explained to Petitioner that statutory rape by an authority figure was a criminal offense that was not diversion eligible. Counsel said that he did not recall discussing the difference between a no contest plea and a guilty plea. Counsel explained that, during plea negotiations, the Assistant District Attorney told him that it was important to the victim to have Petitioner acknowledge his guilt, so he did not attempt to bargain for a no contest plea.

Trial counsel said that he filed for a bill of particulars to establish the time frame within which the statutory rape by an authority figure offenses were alleged to have occurred. Counsel said that he knew the indictments alleged the sexual offense occurred between July 21, 2013, and July 20, 2017, and that effective July 1, 2016, the classification for statutory rape by an authority figure was increased from a C felony to a B felony.

Trial counsel said that he discussed the authority figure element of the charges with Petitioner. He said that Petitioner had given a statement to investigators describing himself as a "father figure" to the victim. Petitioner had also described himself as a "surrogate father" because the victim's father "was not around." Counsel said that Petitioner would "buy the victim gifts, give her cards, take her places" and that Petitioner said that he did things with the victim that he "would do with his own kids." Later in that interview, Petitioner told the investigators that he failed in "[his] role as a father figure." Counsel said that the State intended to use Petitioner's statements, Petitioner's position as Director of Religious Education in the victim's church, his position as the victim's confirmation sponsor, and his relationship with the victim's family as evidence that Petitioner was an authority figure to the victim. Based on the evidence that the State intended to present, counsel thought contesting the authority figure element did not seem to be a strategy that "would have a lot of merit."

On cross-examination by the State, trial counsel identified a document that he had prepared and emailed to Petitioner on September 2, 2020, outlining the charges against Petitioner and the possible sentencing exposure Petitioner faced if convicted. Counsel said that, although he filed a motion for discovery, he received most of the State's discovery from Petitioner's prior counsel. He said that the discovery was provided to Petitioner.

Trial counsel denied that he quit working on the case after his motion to withdraw was denied. He said that he "actually did a lot more work" between the date his motion was denied and date of the trial. Between August 2022 to February 2023, he filed twelve motions, including a motion to suppress, a motion to exclude the recorded phone call, and a response to the State's motion to exclude evidence about the civil lawsuit that the victim had filed against the church. He said that his law clerk at the time reached out to several of the State's witnesses and to the witnesses supplied by Petitioner. He said that his office

- 8 -

contacted or attempted to contact every witness of whom he was aware. Trial counsel prepared four trial binders to organize the discovery and his investigation materials.

On November 18, 2020, trial counsel received a settlement offer from the State whereby Petitioner would plead guilty to statutory rape by an authority figure in counts 5, 6, 7, and 8 in exchange for a sentence of twenty years at thirty percent service and with the remaining counts being dismissed. He met with Petitioner and explained the terms of the offer, the difference in "consecutive versus concurrent sentences," and the consequences of being on the sex offender registry for life. He also advised Petitioner that statutory rape by an authority figure was not a probation-eligible offense. Petitioner told trial counsel that did not want to accept any plea deal, but at the same time, Petitioner said he did not want to take the case to trial. He said that Petitioner continued to believe until a few days before trial that the victim would not go forward and that the case would be dismissed. Trial counsel said that he was prepared to argue a motion to suppress Petitioner's statement to law enforcement and a motion in limine concerning the controlled telephone calls, but a hearing on the motions was continued because a witness for the State could not be present. Petitioner changed his mind and decided that he wanted to accept the plea deal before the motions could be argued.

Trial counsel said that he was prepared for trial. His trial strategy was (1) to highlight the length of time that elapsed between the claimed sexual acts and the victim's coming forward; (2) to attempt to show the victim made up the allegations to help her recover money from the church in a civil action; and (3) to argue there was a lack of "corroborating details."

Petitioner testified that he felt pressured to provide a statement because he was being harassed by law enforcement officers and by people associated with the church. Petitioner testified that, when he spoke to the police, "it was in very vague terms." He described the interview as "in general about [their] relationship. That it had fallen apart. That [he] wasn't in communication with [the victim] anymore."

Petitioner said that initially he did not want to go to trial or take a plea deal because he felt that there were enough witnesses, testimony, and video tapes of specific times that would have shown he was not guilty. Petitioner claimed that he "could have had hundreds of witnesses to the incidences that were alleged to have occurred at St. Rose School." He said that those witnesses would come to court and testify "still to this day." Petitioner claimed that, when he entered his guilty plea, he "came in that day defeated." He said that he "knew that the only thing that [he] had in front of [him] was to take the plea deal. That was it, or face life." Petitioner claimed that the only reason that he agreed to the plea "was because we weren't ready for trial."

When asked why he agreed that the factual basis provided by the State during the plea colloquy was essentially true, Petitioner explained:

And, you know, I thought about that that day sitting in that chair. Actually, some of the things that the State brought up and said blindsided me. I had no idea of some of the things that they would have known. I believe they said that [the victim's mother] and I had a -- I forget the exact wording for it -- relationship. And I had never heard of that before, where that would have come from on the record or anything of that nature. So, there were some things that were argued in that point that I was blindsided by.

The following dialogue between the Assistant District Attorney General and Petitioner then occurred:

Q. You had no other choice but to lie to this Court over and over again? That's your testimony here today?

A. I did not lie to the Court. Whenever I accepted what the plea agreement was, I had no other option. I had -- okay, if I would have said no, I would have had an attorney that wasn't ready to go to court.

Petitioner claimed that trial counsel should have contested the "authority figure" element of the statutory rape charges. He claimed that his statement to the police that he "love[d] her like a father" did not mean he loved her "romantically." He said that a "confirmation sponsor is not somebody that has authority over" the person being confirmed. He said that he felt the claim that he was an authority figure "was overreaching."

Petitioner was questioned extensively on cross-examination about multiple Facebook messages that he sent to the victim and the controlled telephone calls with the victim recorded by Detective Oeser during her investigation. When asked if he recalled the victim's asking him, "[W]hat was it about me at 13 that made you start thinking of me as a sexual being," Petitioner stated, "If it's on there, then she must have. But I do not recall that question." Petitioner then explained that he thought of the victim more as an adult rather than as a 13-year-old because the victim was "not like a regular 13-year-old. She articulates herself as an older person." Petitioner said that he did not know that the State had Facebook messages until a few days before trial when he was going through the Clio Legal Management information that had been provided by trial counsel.

Petitioner denied stating in the controlled calls or in the Facebook messages that he had a sexual relationship with the victim when she was between the ages of 13 and 16. He

claimed that he "did not have any kind of conversation with her about that. There might have been undertones about it the way it sounded, but we were talking about our relationship." The following dialogue, with questioning by the State and answers by Petitioner, then occurred:

Q. Well, what about when you said, I loved e***** you out? What about that? Was that a sexual act or something else, [Petitioner]?

A. If I said that, then it would have had to have been. But I do not recall saying that.

Q. What about when you asked her, you miss going down on me, don't you? So, were you talking about a sexual act when you said to her, you miss going down on me, don't you, feeling me in your mouth warm and full? Was that not a sexual act you were talking about [. . .]

A. If that's what I said --

Q. -- from when you had a relationship with her?

A. If that's what I said, then that's -- absolutely, I can't deny that.

Q. You also admit performing anal sex on her multiple times in that call?

A. I do not recall that.

Q. You say that the picture you took of her that you still love looking at was the picture you took right after anal? You don't remember that?

A. No, I do not remember that.

Q. But if it's there, you said it, right?

A. Well, I mean, if it's my voice, I can't deny it. But I do not remember that.

Q. So, all those times you talked about having sex with [the victim] on that phone call, were you alone with her or not during those times?

A. I can't remember the conversation, so I would say that I don't know.

Q. Okay. And all those times you told the detectives about having sex with her in your office and at the church and various places, were you alone with her or not during those times?

A. I don't ever recall saying that to the detectives.
. . . .
A. I mean, if it's on the recording. But I don't recall ever saying that.

When questioned about the sexually graphic photographs that he sent to the victim, Petitioner claimed that the photographs did not "have anything to do with the case at all" because the victim was an adult when he sent them.

### Post-Conviction Court's Order

The post-conviction court entered a written order making extensive findings of fact and conclusions of law and addressing the claims raised in the Petition. The court noted that, at the guilty plea submission hearing, Petitioner admitted that the factual basis provided by the State was essentially true, that he was satisfied with trial counsel's representation, that trial counsel "had done all [Petitioner] asked him to do," and that he was entering the plea freely and voluntarily.

Regarding the claim that Petitioner received ineffective assistance of counsel because trial counsel failed to argue the motion to suppress, the post-conviction court found that claim was waived as a result of the guilty plea entered by Petitioner. The court further found that Petitioner failed to present any proof to show that the motion to suppress would have been granted, or if granted, would have resulted in a different outcome if the case had gone to trial.

Concerning the claim that trial counsel's performance was deficient because he failed to interview and call certain fact and character witnesses, the court found that Petitioner failed to produce any of those witnesses at the post-conviction hearing. Concerning the videos from the church, the court found that Petitioner failed to produce the videos or any testimony, other than Petitioner's testimony, about the videos at the post-conviction hearing. The court also found there was no credible proof that the video from the sacristy of the St. Rose of Lima Catholic Church ever actually existed.

The post-conviction court found the claim that trial counsel failed to adequately explain the difference between a guilty plea and a no contest plea was without merit because, even if true, there was no prejudice to the defense. The court accredited trial counsel's testimony and found that all of the discovery was provided to Petitioner. The court found that Petitioner presented no credible proof at the post-conviction hearing to

- 12 -

show that Petitioner was anything other than an authority figure pursuant to Tennessee Code Annotated section 39-13-532(a)(3).

The post-conviction court found that Petitioner's claim that his conviction was based on an unlawfully induced guilty plea and that he pleaded guilty without understanding of the nature and consequences of the plea was contrary to Petitioner's testimony during the entry of the negotiated plea. The court noted that Petitioner testified at the plea submission hearing that he was satisfied with trial counsel's representation, that counsel explained what the State would have to prove for him to be found guilty, that he signed and understood the written plea agreement, and that he was freely and voluntarily pleading guilty.

Concerning the claim that trial counsel was not prepared for trial, the post-conviction court found that trial counsel provided Petitioner a detailed summary of the charges and the corresponding sentencing exposure if convicted; constructed a three-pronged defense strategy in preparation for trial; produced and/or made all of the discovery available to [Petitioner], including written and electronic discovery; provided Petitioner an opportunity to view all of the audio and video recordings produced in discovery; contacted or attempted to contact all potential witnesses in preparation for the trial; met with Petitioner on a monthly basis leading up to the trial date; and filed twelve pre-trial motions, specifically two evidentiary motions seeking to limit the introduction of evidence the State intended to produce at trial. The post-conviction court concluded that trial counsel represented Petitioner "very well" and was prepared for trial. The post-conviction court found trial counsel's testimony to be credible.

In contrast, the post-conviction court found Petitioner was not credible. Specifically, the court found that Petitioner "had consistent difficulty directly answering yes or no questions," avoided questions, "had difficulty recalling his prior inculpatory statements contained in exhibits produced by the State," and had "selective memory that amounted to either a high level of convenience or a full measure of attempted manipulation."

The post-conviction court concluded that Petitioner failed to prove by clear and convincing evidence that he received ineffective assistance of counsel, that he was prejudiced by any alleged deficient performance, or that his conviction or sentence was void or voidable because of the abridgment of any constitutional right. The post-conviction court denied relief.

Petitioner timely appealed.

## Analysis

On appeal, Petitioner claims that trial counsel was ineffective because counsel: (1) was unprepared for trial and failed to develop a defense; (2) failed to inform him "of the potential merits of his motion to suppress the State's evidence before Petitioner agreed to a plea agreement and failed to explain "the substantive differences in the potential pleas before him"; and (3) failed to contact material witnesses named by Petitioner that may have benefited his defense. The State argues that the post-conviction court properly denied relief because Petitioner failed to show that counsel was ineffective. We agree with the State.

## Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *State v. Henley*, 960 S.W.2d 572, 579 (Tenn. 1997)); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose,* 523 S.W. 930 (Tenn. 1975)); *see also Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see Dorsey v. State*, No. W2021-01135-CCA-R3-PC, 2022 WL 2840738, at *4 (Tenn. Crim. App. July 21, 2022), *perm. app. denied* (Dec. 14, 2022). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

*Preparation for Trial and Development of a Defense*

Trial counsel has a duty to conduct "appropriate investigations, both factual and legal," and to prepare for trial. *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (quoting *Baxter*, 523 S.W.2d at 932-33) (internal quotation marks omitted). "'Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.'" *Baxter*, 523 S.W.2d at 932-33 (quoting *United States v. DeCoster*, 487 F.2d 1197, 1203 (D.C. Cir. 1973)).

Petitioner claims that trial counsel provided ineffective assistance of counsel because he was unprepared for trial and failed to develop a defense. Trial counsel testified that he obtained and reviewed the discovery, that he filed for a bill of particulars, that he or members of his office staff contacted or attempted to contact every known potential witness provided by Petitioner, and that he filed twelve pretrial motions, including a motion

to suppress Petitioner's statements to police and a motion in limine concerning the controlled telephone call with the victim. Trial counsel prepared four trial binders to organize the discovery and his investigation materials. Trial counsel developed a plan for the defense that involved three prongs: (1) highlighting the length of time that elapsed between the claimed sexual acts and the victim coming forward; (2) attempting to show that the victim made the allegations to help her recover money from the church in a civil action; and (3) arguing there was a lack of "corroborating details." Trial counsel testified that he was prepared to argue the pretrial motions and that he was ready for trial. As previously stated, the post-conviction court found trial counsel's testimony credible.

The only "proof" in the record that trial counsel was not ready for trial or that trial counsel failed to formulate a defense was Petitioner's testimony. The post-conviction court found that Petitioner was not credible. Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Petitioner failed to present any credible proof to show that trial counsel's trial preparation or his formulation of a trial strategy fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Petitioner's claims are devoid of merit.

*Failure to Inform Petitioner of the Potential Merits of his Motion to Suppress*

Trial counsel said that he was prepared to argue the motion to suppress Petitioner's statement to law enforcement and a motion in limine concerning the controlled telephone calls at a pretrial hearing, but the motions were continued because a witness for the State could not be present. Approximately a week after the motions were continued and shortly before trial, Petitioner informed trial counsel that he wanted to accept the plea offer and plead guilty even though the motions were pending. During an exchange with the trial court at the plea submission hearing, Petitioner acknowledged that he and trial counsel had discussed the pending evidentiary motions and that he wanted to waive those motions and enter guilty pleas.

Petitioner testified that trial counsel failed to inform him about the merits of the motion to suppress and that, if trial counsel had explained "what he had moved to suppress, the evidence's impact on the charges before him, and the potential leverage gained in plea negotiations if granted, [Petitioner] would not have accepted the plea deal[.]" The only "proof" supporting Petitioner's claim that trial counsel did not discuss the merits of the motion was Petitioner's testimony. As mentioned previously, the trial court found Petitioner not to be credible. Petitioner has failed to provide any credible evidence that trial counsel was deficient in failing to explain the merits, if any, of the motion to suppress. Petitioner's claim is also without merit.

*Failure to Call Material Witnesses*

When a petitioner claims that trial counsel was ineffective for failing to discover, interview, or present a witness in support of the petitioner's defense, such witness should be presented at the post-conviction hearing. *State v. Black*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As this court has previously stated:

> As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

*Id.*

Petitioner testified at the post-conviction hearing that he "could have had hundreds of witnesses to the incidences that were alleged to have occurred at St. Rose School" testify on his behalf at a trial. He also testified those witnesses would still be willing to testify for him. Nevertheless, Petitioner did not call a single one of the alleged hundreds of witnesses to testify at the post-conviction hearing. Thus, even if we were to assume that trial counsel was somehow deficient in failing to interview or call witnesses, Petitioner has failed to establish prejudice because none of those witnesses testified at the post-conviction hearing. *See id.* at 757. This claim is without merit.

## Conclusion

We affirm the post-conviction court's judgment denying post-conviction relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 17 -